# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| Case No. 10-00235<br>(Chapter 7)<br>In re MAUI INDUSTRIAL LOAN &<br>FINANCE CO.,<br><br>               Debtor. | **CASE NO. 17-cv-00394-DKW-KSC**<br><br>On Appeal From The Bankruptcy<br>Court's Final Judgment as to Trustee's<br>Objection to RNI-NV Limited<br>Partnership's Proof of Claim<br>(POC#21), July 31, 2017 (Docket 907) |

**APPELLANT RNI-NV LIMITED PARTNERSHIP'S
OPENING BRIEF ON APPEAL
EXHIBITS 1 – 3;
CORPORATE DISCLOSURE STATEMENT;
CERTIFICATE OF COMPLIANCE;
CERTIFICATE OF SERVICE**

O'CONNOR PLAYDON GUBEN &
INOUYE LLP
A LIMITED LIABILITY LAW PARTNERSHIP

JERROLD K. GUBEN   3107-0
RANDOLPH R. SLATON  1647-0
JEFFERY S. FLORES  8691-0
Makai Tower,  24th Floor
733 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 524-8350
jkg@opgilaw.com
rrs@opgilaw.com
jsf@opgilaw.com

Attorneys for Appellant
RNI-NV LIMITED PARTNERSHIP

## CORPORATE DISCLOSURE STATEMENT

Appellant RNI-NV LIMITED PARTNERSHIP is a privately owned limited partnership with no parent corporation or entity, no subsidiary corporation or entity and no publicly held corporation that owns any of its limited partnership units.

# TABLE OF CONTENTS

I.     STATEMENT OF JURISDICTION ..................................................1

II.    STANDARD OF REVIEW .............................................................1

III.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .............2

IV.   STATEMENT OF THE CASE .......................................................2

V.     ARGUMENT.................................................................................5

      A. SUMMARY OF THE ARGUMENT ................................................6

      B. THE TRUSTEE USED THE WRONG PROCEDURE TO
         OBJECT TO RNI'S CLAIM. ...................................................6

      C. RNI SHOULD BE CLASSIFIED AS A "CLASS A" CREDITOR. ...................8

      D. RNI'S CLAIM IS VALID UNDER § 502(B)(1) ............................22

VI.   CONCLUSION ...........................................................................30

# TABLE OF AUTHORITIES

## Federal Cases

*Christian Brothers High School Endowment v. Bayou No Leverage Fund
(In re Bayou Group)*, 439 B.R. 284 (S.D.N.Y. 2010) ................................... 21, 22

*Committee of Unsecured Creditors v. Commodity Credit Corp.
(In re K.F. Dairies, Inc.)*, 143 B.R. 734 (9th Cir. BAP 1992) .............................13

*Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424 (1923) ....................... 6, 10, 11, 20

*Cuzco Development U.S.A., LLC, v. JCCHO Hawaii, LLC (In re Cuzco
Development U.S.A., LLC)*, 1:16-cv-006320JMS-KSC10 (D. Haw.) ..................16

*Davis v. Four Seasons Hotel Ltd.*, 810 F. Supp. 2d 1145 (D. Haw. 2011) .............16

*Diamant v. Kasparian (In re Southern Cal. Plastics, Inc.)*,
165 F.3d 1243 (9th Cir.1999) .................................................................................29

*Disimone v. Browner*, 121 F.3d 1262 (9th Cir. 1997) .............................................28

*District of Columbia's Court of Appeals v. Feldman*, 460 U.S. 462 (1983) ...........27

*Field v. Decoite (In re Maui Indus. Loan & Fin. Co.)*,
2013 U.S. Dist. LEXIS 83254 (D. Haw. 2013).....................................................3

*Henshaw v. Field (In re Henshaw),* 670 Fed. Appx. 594 (9th Cir. 2016) ........ 27, 28

*In re CWS Enterprises, Inc.*, ___ F.3d ____, 2017 WL 4051708
(9th Cir. Sept. 14, 2017) .......................................................................................29

*In re DBSI, Inc.*, 2017 U.S. App. LEXIS 16817 (9th Cir. 2017)..................... 11, 17

*In re Hoku Solar, Inc.*, 2016 WL 563036 (D.Bank. Idaho, February 12, 2016) .......9

*In re KF Dairies, Inc.*, 143 B.R. 734 (9th Cir. BAP 1992) ....................................13

*In re Los Angeles Land and Invs., Ltd.*, 282 F. Supp. 448 (D. Haw. 1968) ...........18

*In re MicroAge, Inc.*, 291 B.R. 503 (9th Cir. BAP 2002)................................ 1, 9, 13

*In re USA Commercial Mortgage, Co.*, 377 B.R. 608 (9th Cir. BAP 2007) .............8

*International Corp. v. Library Asset Acquisition Company* ......................................8

*Johnson v. Righetti (In re Johnson)*, 756 F.2d 738 (9th Cir.1985)..........................29

*Margaret B. McGimsey Trust v. USA Capital Diversified Trust Deed Fund, LLC
(In re USA Commer. Mortg. Co.),* 377 B.R. 608 (9th Cir. BAP 20070)................7

*Moore v. Deutsche Bank Nat'l Tr. Co. (In re Moore)*,
  2011 U.S. Dist. LEXIS 132772 (D. Haw. 2011) .................................................1

*Rooker v. Fidelity Trust*, 263 U.S. 413 (1925) .......................................................27

*Scholes v. Lehman*, 56 F.3d 750, 757-758 (7th Cir. 1995) ......................................21

*Screen Capital International Corp. v. Library Asset Acquisition
  Company Ltd.*, 510 B.R. 266 (C.D. Cal. 2014) ....................................................8

*In re Slatkin*, 525 F.3d 805 (9th Cir. 2008) .................................................. 9, 21, 22

*Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323 (9th Cir. 1994) ......... 2, 18

*Stoebner v. Ritchie Capital Mgmt., L.L.C. (In re Polaroid Corp.)*,
  472 B.R. 22 (Bankr. D. Minn. 2012) ....................................................................29

*Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir. 1996) ................................................28

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
  484 U.S. 365 (1988) .............................................................................................17

## Docketed Cases

*Field v. RNI-NV Limited Partnership*, Adv. No. 10-90069 (D.Bankr. Hawaii)
  .......................................................................................................... passim

*RNI-NV Limited Partnership v. Maui Industrial Loan & Finance Company, Inc.*,
  Civil No. 09-1-0037 (Second Circuit, State of Hawaii) .......................................4

## Federal Statutes

11 U.S.C. § 108 ........................................................................................................28
11 U.S.C. § 502 ........................................................................................................26
11 U.S.C. § 502(b)(1) ..................................................................................... passim
11 U.S.C. § 502(d) ......................................................................................... passim
11 U.S.C. § 510 ............................................................................................... passim
11 U.S.C. § 510(b) .....................................................................................................7
11 U.S.C. § 544 ........................................................................................................10
11 U.S.C. § 57g (Bankruptcy Act) ........................................................... 11, 13, 14
28 U.S.C. § 157(b) .....................................................................................................1
28 U.S.C. § 158(a)(1)/(d) ...........................................................................................1

## State Statutes

Haw. Rev. Stat. § 412:3-612 ...................................................................................17
Haw. Rev. Stat. § 412:9-500 ............................................................................ passim
Haw. Rev. Stat. § 414-111 ............................................................................... passim

Haw. Rev. Stat. § 414-111(c) ........................................................ 20, 23

Haw. Rev. Stat. § 651C-4(a) ............................................ 24, 25, 26, 27

Haw. Rev. Stat. § 651C-8 ..........................................................24

## Other Authorities

*Restatement (Second) of Contracts* § 164 (1979) ............................................. 23, 28

*Restatement (Second) of Contracts* § 376 (1979) ............................................. 23, 28

*Restatement (Second) Judgments,* § 27 (1982) .....................................................26

## Federal Rules

F.R.Bk.P. Rule 7001 ........................................................................7, 8

F.R.Bk.P. Rule 7001(8) ............................................................... 7, 31

## Local Rules

L.B.R. 3007-1(d) ........................................................... 6, 7, 32, 39

## Treatises

3 *Collier on Bankruptcy,* ¶ 57.19 (14th ed. 1979) ..................................................11

4 *Collier on Bankruptcy,* ¶ 502.05[2] at p. 502-56 (16th ed. 2017) .......................12

9 *Collier on Bankruptcy,* ¶ 3007.02 at 3007-12 at n. 4 (16th ed. 2017) ...................7

## APPELLANT'S OPENING BRIEF

Appellant RNI-NV LIMITED PARTNERSHIP ("RNI") requests that its claim be allowed as a Class A claim in the amount of $1,000,000, which RNI paid to the pre-petition Debtor, Maui Industrial Loan & Finance Co. ("MFC"), or in the amount of $1,428,324.90, which RNI repaid to the Trustee pursuant to 11 U.S.C. § 502(d), or in an amount to be determined by the Bankruptcy Court.

## I.      STATEMENT OF JURISDICTION

The Bankruptcy Court had jurisdiction over this core bankruptcy matter pursuant to 28 U.S.C. § 157(b), and entered its final judgment on July 31, 2017. RNI filed its Notice of Appeal on August 8, 2017.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1)/(d).

## II.      STANDARD OF REVIEW

The *de novo* standard of review applies to the Bankruptcy Court's conclusions of law and mixed questions of law and fact, *Moore v. Deutsche Bank Nat'l Tr. Co. (In re Moore)*, 2011 U.S. Dist. LEXIS 132772, at *3-5 (D. Haw. 2011); to the application of 11 U.S.C. § 502(d) to classes of claims, *In re MicroAge, Inc.*, 291 B.R. 503 (B.A.P. 9th Cir. 2002); and to the availability of collateral estoppel, *Gayden v. Nourbakhsh (In re Nourbakhsh),* 67 F.3d 798, 800-01 (9th Cir. 1995).  ". . . [A] bankruptcy court's finding that a claim is or is not

1

substantially similar to other claims, constitutes a finding of fact reviewable under the clearly erroneous standard." *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994)

## III.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

RNI incorporates by reference the issues set forth in its "Statement of Issues on Appeal," August 22, 2017 (attached as Exhibit 1).  Record on Appeal, Docket 928, at 6-12 (hereinafter "Dkt. xxx:yy") (docket entries are to the main case, Case No. 10-00235, except as noted to the Adversary Proceeding, 10-90069, "Adv. Proc.").  The *de novo* standard of review is applicable to each of the issues except for the issue of impermissibly classifying substantially similar claims, which is reviewed under the "clearly erroneous" standard.

## IV.   STATEMENT OF THE CASE

MFC was a Hawaii corporation licensed as a nondepository financial services loan company under § 412:9-500, H.R.S., by which MFC was authorized to borrow funds from licensed commercial banks and "make loans but . . . not . . . to accept deposits from the public."[1]  "For many years

---

[1]   "Memorandum of Decision on Trustee's Motion for Instructions as to Distribution Rights of Certain Creditors," *In re Maui Industrial Loan & Finance Co., Inc.*, Case No 10-00235, September 7, 2017, at 1,   https://www.gpo.gov/fdsys/pkg/USCOURTS-hib-1_10-bk-00235/pdf/USCOURTS-hib-1_10-bk-00235-0.pdf.  See *Westlands Water Dist. v. United States*, 153 F. Supp. 2d 1133, 1143, n.9

Lloyd Kimura ('Kimura') ran Debtor [MFC] as a Ponzi scheme. . ." and ". . . on January 5, 2011, Kimura pleaded guilty to numerous federal felonies . . . and admitted that he ran MFC as a Ponzi scheme. . . ." *Field v. Decoite (In re Maui Indus. Loan & Fin. Co.)*, 2013 U.S. Dist. LEXIS 83254, at *1, *5 (D. Haw. 2013).  As Judge  Robert J. Faris noted:

> . . . Mr. Kimura admitted that he operated MFC as a Ponzi scheme for about twenty-three years [prior to the 2010 filing].  He caused MFC to "borrow" money from investors in exchange for promised returns, and to repay the loans and the promised returns mostly with funds borrowed from subsequent investors.  Eventually, the iron laws of mathematics caused the scheme to collapse.[2]

Neither RNI nor any of the depositors or "investors" who had invested money with MFC was aware of the Ponzi scheme until Mr. Kimura pled guilty in this Court on January 5, 2011.  Along with many of Mr. Kimura's other clients, RNI also was duped and was itself a victim.

Beginning in 1999, RNI transferred $1,000,000 in four installments to MFC in an attempt to purchase a 40% interest in MFC.  In 2007, as amended in 2008, MFC agreed to "redeem" RNI's purported equity interest in MFC through a series of payments.  Dkt. 46-4:1-6.Ex. D, Adv. Proc.).  As part of the "redemption" agreement, toward the $1,000,000 that RNI paid in 1999, MFC transferred

---

(E.D. Cal. 2001) ("Internet citations are appropriate for background information. *Accord Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94, 2001 WL 636207 (2001) (citing Internet)").

[2] *See* "Memorandum of Decision," *supra*, n. 1, at 2.

3

$1,040,000 to RNI through October 2008.  Dkt. 45:5 (and attached exhibits referenced).  Ultimately, MFC was unable to continue making payments under the notes and on January 20, 2009, RNI filed a complaint against MFC in *RNI-NV Limited Partnership v. Maui Industrial Loan & Finance Company, Inc.* (Second Circuit, State of Hawaii) (hereinafter "Civil No. 09-1-0037").  Dkt. 45:9. After a contested motion for summary judgment, RNI obtained a judgment of $1,892,052.00 on November 4, 2009.  Dkt**., Apr. 1, 2010, Proof of Claim No. 21 (from Claims Registry), Ex. H.**  In the meantime, on October 19, 2009, the State of Hawaii Department of Commerce and Consumer Affairs ("DCCA") issued a temporary cease and desist order to MFC and a permanent cease and desist order on November 3, 2009 (Dkt. 33:8, Ex. 18), more than one year after RNI received its <u>final</u> transfer from MFC on October 9, 2008.

"After a state regulator ordered MFC to cease doing business, MFC commenced this bankruptcy case,"[3] on January 28, 2010, and RNI timely filed its Proof of Claim No. 21 for $1,938,186.97.  Dkt. 1:1.  The Trustee sued RNI under § 544[4] in Adversary Proceeding No. 10-90069, alleging that RNI had received an avoidable transfer of $1,040,000 under Chapter 651C, H.R.S. (Hawaii's Uniform Fraudulent Transfer Act), or as an unlawful dividend under § 414-111, H.R.S. Dkt. 1:1 (Adv. No. 10-90069).  On May 16, 2011, the Bankruptcy Court entered its

---

[3]  *See* "Memorandum of Decision," *supra*, n. 1, at 2.
[4]  All later bankruptcy statutory references are to 11 U.S.C. "§ ___."

judgment in favor of the Trustee.   Dkt. 61:1 Adv. No. 10-90069.   On June 17, 2011, RNI posted an appeal bond, Dkt. 89:1 Adv. No. 10-90069), pending its appeal, ultimately, to the Ninth Circuit Court of Appeals.

After RNI's unsuccessful appeals, the Trustee executed on RNI's appeal bond and filed a Satisfaction of Judgment for the $1,428,324.90 that RNI paid to the Estate to restore the avoided transfers, including pre- and post-judgment interest, Dkt. 110 (Adv. No. 10-90069).   The Trustee filed a "Notice of Receipt of Payment on Judgment in Adversary Proceeding," Dkt. 619:1, and acknowledged that ". . . RNI 'account[ed] to the estate for its liability.'"   Dkt. 884:9, 10.

In the main case the Trustee filed a Motion to Approve Procedure to determine how to distribute the proceeds that he had collected during his administration of the case.   Dkt.838:1.   The Motion proposed payments to MFC lenders, investors and depositors as Class A creditors but scheduled RNI's claim at $0 (Dkt., 234:6), even though RNI had contributed $1,428,324.90 to the Estate pursuant to § 502(d).   The Trustee then sought to disallow RNI's claim under § 502(b)(1) as a Class A type creditor.   Dkt. 860:1. The Bankruptcy Court's final judgment disallowing RNI's claim was entered on July 31, 2017, Dkt. 907:1, and RNI filed its notice of appeal on August 8, 2017.   Dkt.  915:1.

## V.    ARGUMENT

### A.   SUMMARY OF THE ARGUMENT

*The outstanding facts are not really in dispute.  It is only in the interpretation of those facts that our difference of view arises.*

*See Cunningham v. Brown*, 265 U.S. 1, 9, 44 S. Ct. 424, 426, 68 L.Ed. 873, 876 (1924) (the origin of Ponzi scheme case law, holding that all Ponzi schemes are insolvent *ab initio*).

**In this case of first impression**, the Bankruptcy Court **failed to follow controlling Ninth Circuit** case law, Rule 3007(b), F.R.Bk. P., LBR 3007-1(d), and the official form for an Objection to Claim by not requiring the Trustee to file an adversary proceeding; **wrongly applied issue preclusion** since § 502(d) gave RNI as the transferee of an avoided transfer a "clean slate" after it repaid the Estate the avoided transfer; **misinterpreted** the unambiguous language of **§ 502(b)(1)** and disallowed RNI's claim after (i) RNI paid MFC $1,000,000 in 1999, and (ii) the Trustee recovered the $1,040,000 when RNI repaid $1,428,324.90 under § 502(d).

### B.   THE TRUSTEEE USED THE WRONG PROCEDURE  TO OBJECT TO RNI'S CLAIM

Using Official Form hib_3007-1 (Exhibit 1, hereinafter "Ex. 1"), the Trustee filed a Rule 3007(a), F.R.Bk.P. objection seeking to disallow RNI's claim and to subordinate RNI's claim pursuant to § 510.  Dkt. 860:1.  Under Rule 3007(b), F.R.Bk.P. (Ex. 1), and LBR 3007-1(d) (Ex. 1), the Bankruptcy Court had to dismiss the Trustee's objection without prejudice and require, as RNI requested,

that the Trustee proceed pursuant to Rule 7001(8), F.R.Bk.P., which provides that "a proceeding to subordinate any allowed claim or interest" must be brought by way of an adversary proceeding pursuant to Rule 7001, F.R.Bk.P.  ". . . [F]ailure to comply with Rule 7001 could result in dismissal of the claim objections on procedural grounds. . . . Subordination of a claim pursuant to section 510 of the Code is also by adversary proceeding.  Fed. R. Bankr.P. 7001."  9 COLLIER ON BANKRUPTCY, ¶ 3007.02 at 3007-12, n. 4 (16th ed. 2017).  *See Margaret B. McGimsey Trust v. USA Capital Diversified Trust Deed Fund, LLC (In re USA Commer. Mortg. Co.),* 377 B.R. 608, 620, n. 13 (9th Cir. BAP 20070("We disagree with the bankruptcy court's view . . . that Rule 7001(8) does not apply to § 510(b). . . . Rule 7001(8) does not distinguish between types of subordination.  Thus, all types of subordination fall under this rule").

In the Ninth Circuit, an adversary proceeding is required when the claim objection also requests relief "of the kind specified in Rule 7001."  *In re Copper King Inn Inc.*, 918 F.2d 1404 (9th Cir. 1990).  "'If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding.'"  918 F.2d at 1406.  While the *Copper King* panel noted that the right to an adversary proceeding could be waived by the claimaint's inaction, the court concluded that "Of course, if a party does object at a hearing [as did RNI], and Rules 3007 and 7001 apply, an 'adversarial' hearing **should without**

**question be held**." 918 F.2d 1407, n.5 (emphasis added). *See also Screen Capital International Corp. v. Library Asset Acquisition Company Ltd.,* 510 B.R. 266 (C.D. Cal. 2014) (when a Rule 3007(b) objection to a claim is combined with the type of relief specified in Rule 7001, including subordination, the matter must proceed by way of an adversary complaint and not a combined Rule 3007(a) and Rule 9014 "contested matter"); *In re USA Commercial Mortgage, Co.*, 377 B.R. 608, 620, n. 13 (9th Cir. BAP 2007).

Pursuant to *Copper King*, RNI objected in writing (Dkt. 875:17), to the Trustee pursuing a combined objection and subordination of RNI's claim by way of a Rule 3007(a) and/or Rule 9014 "contested matter." Dkt. 875:17. The Bankruptcy Court erred by not adhering to controlling Ninth Circuit precedent,[5] applicable rules and its own Official Form in not dismissing the Trustee's objection to RNI's claim without prejudice.

## C.    RNI SHOULD BE CLASSIFIED AS A "CLASS A" CREDITOR.

As MFC was a Ponzi scheme, the minimum amount that RNI can recover on its claim is the $1,000,000.00 paid to MFC or the $1,428,324.90 that RNI repaid to

---

[5] As the Bankruptcy Court did not address the Trustee's subordination argument, RNI does not address that argument other than to note that neither party was able to locate a single case addressing § 510(b) in the context of a Ponzi scheme. The absence of a single case is not surprising since the economic reality of a Ponzi scheme does not "fit" the policies under § 510(b). In addition, the financial transactions, payments, deposits, receipts and so forth that are inherent in a Ponzi scheme demonstrate why a subordination claim must be brought as an adversary proceeding instead of being addressed in the expedited "contested hearing" format.

the Estate pursuant to § 502(d) (Ex. 1).  *See, e..g, In re Slatkin*, 525 F.3d 805 (9th Cir. 2008).[6]  The court in *In re Hoku Solar, Inc.*, 2016 Bankr. LEXIS 460, at *15-16 (D. Bank. Id. 2016), addressed the interplay between § 502(b)(1) and § 502(d), and held that in applying § 502(d) a court must consider its "two purposes," a creditor sharing in any distribution while remaining indebted to the estate and its "coercive effect of insuring compliance with judicial orders" (citing *In re MicroAge, Inc.,* 291 B.R. 503, 511 (9th Cir. BAP 2002).  "Disallowing [a] claim [after repayment] serves neither of these purposes. In fact, in terms of equality of distribution, it works against it." *Id.*  The court noted that:

> . . . allowing [the] claim promotes a more equitable distribution. . . . [I]f [the claimant] repays . . . some or all of money it received . . . then [the claimant] will participate in a creditor distributions for that amount to the same extent as . . . other unpaid creditors.  Simply put, disallowing [the] claim contravenes the first purpose of § 502(d).

The Trustee's acceptance of RNI's payment of $1,428,324.90 satisfies the "clean slate" purposes of § 502(d), which balances the unique standing and avoidance powers of a bankruptcy trustee provided by § 544 that might not exist

---

[6] RNI filed its proof of claim on April 1, 2010, before Mr. Kimura's criminal plea agreement on January 5, 2011, and thus RNI's claim of April 1, 2010, included all accrued pre-petition interest awarded in the November 4, 2009, state court judgment. RNI, like the Class A creditors (Dkt. 838:1), cannot claim, or receive, any accrued interest or any amounts over the actual payment to MFC. *Cf. Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 855 F.3d 459, 469-70 (2d Cir. 2017).

outside bankruptcy law.[7]   Treating the creditors—all of them, including RNI and the depositor-investors, as being Mr. Kimura's victims—equally is required under the facts of this case and applicable case law since "equality is equity, and this is the spirit of the bankrupt [*sic*] law."   As the Supreme Court noted in *Cunningham v. Brown*, *supra*, the original Ponzi scheme case:

> . . . the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them. They were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. . . . It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt [*sic*] law. . . .

*Cunningham v. Brown*, *supra,* 265 U.S. at 13, 44 S. Ct. at 427.   *See also In re DBSI, Inc*., 2017 U.S. App. LEXIS 16817, at *22 (9th Cir. 2017)(referring to the "equitable principles and the 'object and policy' of the Bankruptcy Code").

While RNI's appeal was pending and its appeal bond was on deposit with the Bankruptcy Court, the Trustee filed his Motion to Approve Procedure for Bifurcation of Unsecured Claims Filed by Ponzi Scheme Investors.  Dkt. 234:1. At that time RNI's claim was subject to the appeal and the appeal bond, which

---

[7]  Under § 502(d) a bankruptcy court can only disallow claims brought pursuant to the unique powers under bankruptcy law.  In contrast, § 502(b)(1) enables a Bankruptcy Court to disallow a claim that ". . . is unenforceable against the debtor and property of the debtor, under any agreement or applicable law. . . ."  Thus, disallowance under § 502(d) does not automatically result in a disallowance under § 502(b)(1).  A trustee would have the same goal under each section—to disallow a claim—but might be able to succeed under § 502(d) based on unique bankruptcy standing or powers but not under § 502(b)(1).

10

suspended the allowance and participation of RNI's claim in any distribution unless and until RNI satisfied § 502(d).  *See* 3 COLLIER ON BANKRUPTCY ¶ 57.19 (14th ed. 1979)(Bankruptcy Act).  The Trustee's receipt for RNI's payment of the judgment, (Dkt. 619:1), satisfied the requirements of § 502(d), enabling RNI to participate in any distribution from the Estate.

RNI's right to an allowed claim pursuant to § 502(d) is made even clearer by reviewing the history of 11 U.S.C. § 57g of the Bankruptcy Act (repealed), and its re-enactment as § 502(d).  *See* Exhibit 3.  The purpose of § 57g was not to "punish" the transferee of an avoided transfer, including even a "fraudulent transfer" that might have elements of constructive or actual fraud, since an avoided transfer is "cured" by the restoration to the estate of the avoided transfer under § 57g / now § 502(d).  Even though the court avoided MFC's transfer to RNI, because RNI repaid the full amount of the avoided transfers with pre- and post-judgment interest, now the Bankruptcy Court must allow RNI's Class A claim in the amount of $1,000,000.00, or $1,428,324.90, or in an amount to be determined by the Court.[8]  The leading bankruptcy treatise recognizes that after a transferee has repaid the entire avoided amount, with interest, the creditor can participate in

---

[8]  While a creditor in a Ponzi scheme generally cannot claim more than it paid to the creditor, the $1,428,324.90 that RNI paid to the Estate includes interest earned under the appeal bond, post-petition, for which RNI should receive credit.

distributions from the estate up to the amount surrendered to the trustee.  In other words, a creditor who satisfies § 502(d) receives a "clean slate."

Section 502(d) does not bar a creditor who is a transferee of an avoided transfer from filing a claim in the expectation of sharing in any assets but addresses only whether or not the claim will be allowed.  Creditors may disgorge the transferred property and thereby share in MFC's estate for the amount of their claims <u>or</u> decline to file the claim, lose the right to share in the distribution of MFC's assets and face the risk that the trustee will take appropriate action to recover the affected property.  4 COLLIER ON BANKRUPTCY, ¶ 502.05[2], at 502-56 (16th ed. 2017)("creditors who disgorge property . . . are allowed to supplement a claim only in the amount that they surrender to the trustee*).*[9]  Thus, after RNI

---

[9]   Section 502(d) "disallows the claims of creditors who have received avoidable transfers, unless the creditor relinquishes the transfer." *El Paso City of Texas v. America West Airlines, Inc. (In re America West Airlines, Inc.),* 217 F.3d 1161, 1163-64 (9th Cir. 2000).  That section "requires disallowance of a claim of a transferee . . . if the transferee has not paid the amount or turned over the property received as required under the sections under which the transferee's liability arises."  4 COLLIER ON BANKRUPTCY § 502.05. . . .

*Bankr. Estate of Wing Foods, Inc. v. CCF Leasing Co. (In re Wing Foods*), 2010 Bankr. LEXIS 114, at *16 (Bankr. D. Id. 2010)(Pappas, J.).   *See also* "Construction and Application of 11 U.S.C.A § 502(d), Which Disallows Claims of Creditors Who Have Received Avoidable Payments or Transfers Unless Creditor Relinquishes Payment or Transfer," 85 A.L.R. Fed. 2d 411 ("A primary purpose . . . is to promote equal distribution of the debtor's assets among creditors with equal claims . . . but not to punish such parties for initially receiving or withholding the money or property at issue," citations omitted).

complied with § 502(d) by repaying the avoided transfer of $1,040,000.00 plus interest to the Estate, and the Trustee filed his Satisfaction of Judgment, RNI became qualified to participate in a distribution from the estate.[10]

While the Trustee's objection was replete with allegations of misfeasance and even malfeasance, RNI did not engage in actual fraud and § 502(d) does not impose a "morality" test on the repaying creditor.  A transferee who repays the avoided amount is entitled to its claim and becomes eligible to participate in a distribution from the estate.  As COLLIER ON BANKRUPTCY noted with respect to § 57g, the law does not provide for an objection to a claim or non-payment of a claim after restoration of the avoided transfer, whether the pre-petition transfer was the result of "constructive or actual fraud" or simply a "good faith" preference.

> . . . [t]he purpose, the meaning and the limited scope of § 57g . . . may best be summarized in words: "*Restoration, not punishment is the object of this law*".  In none of the various shapes since the Act of 1898 has [it] been intended to declare a forfeiture or impose a penalty.  Its strictly practical approach, free from moralizing discriminations, is

---

[10]   [T]he adoption of § 502(d) was not intended as a departure from [§ 57g]. . . . The normal rule of statutory construction is that, if Congress intends for legislation to change the interpretation of a judicially-created concept, it makes that intent specific. . . . No changes of law or policy should be interpreted from changes of language in revision of a statute unless the intent to make a change is clearly expressed.  *Committee of Unsecured Creditors v. Commodity Credit Corp. (In re K.F. Dairies, Inc.),* 143 B.R. 734, 736 (9th Cir. BAP 1992). . . .

*In re MicroAge, Inc.*, 291 B.R. 503, 508-09 (9th Cir. BAP 2002).  *See also In re KF Dairies, Inc*., 143 B.R. 734, 737-38 (9th Cir. BAP 1992).

> evidenced by the fact that it does not exclude from its application fraudulent transfers, whether the fraud be constructive or actual.

3 COLLIER ON BANKRUPTCY, ¶ 57.19 at 307 (14th ed. 1979) (emphasis in citation).

From and after 1986, contrary to the prohibitions of § 412:9-500, H.R.S. (Ex. 2), MFC issued a variety of financial instruments and documents, including promissory notes and receipts evidencing deposits received from the Class A creditors, all in violation of § 412:9-500. These transactions were contrary to § 412:9-500 since MFC, as a non-depository financial institution, was not authorized to borrow monies or accept deposits from the public but could only borrow from licensed commercial banks.

Relying on its earlier decision on Plaintiff's Motion for Partial Summary Judgment (Dkt. 61:6-8, Adv. Proc.), the Bankruptcy Court <u>erred on at least four grounds</u> when it ruled in its Final Judgment from which this appeal arises that because RNI was the prevailing party in Civil No. 09-1-0037, it was estopped from arguing that its attempted "purchase" of MFC stock was a nullity and void *ab initio*. **First**, when RNI received the pre-petition transfers under the promissory notes in 2007 and 2008, when it filed its Complaint in Civil No. 09-1-0037 and through November 4, 2009, when it obtained its judgment, no one knew that MFC had been operated as a Ponzi scheme since 1986. RNI did not know in 1999 that MFC was being operated as a Ponzi scheme when RNI unwittingly paid $1,000,000 to MFC to purchase an equity interest in a Ponzi scheme, a "legally

14

impossible" transaction, nor did the allowed Class A creditors know that MFC was a Ponzi scheme when they loaned money and received notes and deposit receipts in violation of § 412:9-500.

The Bankruptcy Court's "estoppel" conclusion that prevented RNI from arguing that its initial investment in 1999 was void and thus created a restitution claim, assumes that RNI knew or had reason to know in 1999 or even in January 2009, when the Complaint in Civil No. 09-1-0037 was filed, that MFC was operated as a Ponzi scheme. However, the first suspicion of the Ponzi scheme was DCCA's Temporary Cease and Desist order of November 2009, long after RNI received its final transfer from MFC in October 2008. The economic reality of RNI's "investment" in MFC was no different from that of the other MFC investor-depositors, now, as is RNI, one of MFC's victims.

**Second**, the Bankruptcy Court wrongly interpreted Hawaii statutory law in concluding that allowing RNI a restitution claim for its 1999 "investment" would unjustly enrich RNI and put it on "par" with MFC's Class A creditors, which would be "unfair" to the "other creditors."[11]  (Dkt. 61:7, Adv. Proc.),  While it

---

[11]     . . . **[T]he perception of unfairness is an insufficient basis for the disallowance of a proof of claim**. *See Heath v. American Express Travel Related Servs. Co. (In re Heath),* 331 B.R. 424, 426 (9th Cir. BAP 2005). . . .

It is neither incorrect nor improper for an equity holder to assert a proof of claim based on breach of contract and fraud relating to the

would be unfair if RNI were allowed to retain the $1,040,000 that MFC transferred to it and RNI did not comply with § 502(d), by way of its re-payment to the Trustee, RNI "purged" all "unfairness" *vis-à-vis* the other MFC victims.

"In interpreting Hawaii law . . . the starting point for statutory interpretation is the language of the statute itself. . . . Where a statute's meaning is plain and unambiguous . . . there is no need to attempt to divine legislative intent based on the various events that led to the statute's passage." *Davis v. Four Seasons Hotel Ltd.*, 810 F. Supp. 2d 1145, 1154 (D. Haw. 2011). *See also Cuzco Development U.S.A., LLC, v. JCCHO Hawaii, LLC (In re Cuzco Development U.S.A., LLC)*, 1:16-cv-006320JMS-KSC, at 10 (D. Haw. May 3, 2017)("Once the Bankruptcy Court acknowledged the plain reading of the statute . . . its 'sole duty' was to give effect to that reading"). In statutory interpretation, a court:

> . . . must look not only to the "particular statutory language at issue" but also to "the language and design of the statute as a whole." [Citations omitted.] Statutory construction is a "holistic endeavor,"

> purchase of a security and also a proof of interest. The Code specifically contemplates this. . . . § 510(b) subordinates certain claims that are necessarily held by equity holders. Equity holders must *a fortiori* be entitled to assert proofs of claim in addition to proofs of interest or there would be nothing to subordinate under § 510(b). If, in fact, an equity holder could not assert both a proof of claim and a proof of interest, then § 510(b) in most cases would have little to no meaning. . . .

*In re USA Commercial Mortg. Co.,* 377 B.R. 608, 615–16 (B.A.P. 9th Cir. 2007)(emphasis supplied).

16

> *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
> 484 U.S. 365, 371 (1988), that relies on context to be "a preliminary
> determinant of meaning,"   Antonin Scalia & Bryan A. Garner,
> READING LAW: THE INTERPRETATION OF LEGAL TEXTS 168 (2012). . . .

*In re DBSI, Inc*., 2017 U.S. App. LEXIS 16817, at *11 (9th Cir. 2017).

The Bankruptcy Court concluded that RNI's attempted equity purchase without prior DCCA approval violated § 412:3-612 and its receipt of "unlawful dividends" violated §§ 412:9-500 and 414-111, **but the Class A creditors** who received promissory notes, investment certificates or deposit receipts for their loans to and deposits with MFC **also received advances from MFC** that violated § 412:9-500.   While these other victims were also duped or "gulled" into transactions that were prohibited under § 412:9-500, the Bankruptcy Court applied § 412:9-500 <u>only against</u> RNI even though "the trustee holds about $8 million in funds for distribution," of which "[t]he timely filed claims [other than RNI's claim] amount to about $8.1 million, of which about $5.8 million is the principal amount and about $2.3 million represents investment returns."   Memorandum of Decision on Trustee's Motion for Instructions as to Distribution Rights of Certain Creditors, Dkt. 930, at 3, Sept. 7, 2017 (rendered after RNI filed this appeal, *see* Ex. 3).

Just as the Bankruptcy Court found that the Class A creditors are entitled to a "restitution" claim (even though they received promissory notes and deposit receipts in violation of § 412:9-500), RNI also was a MFC victim except that the evidence of RNI's victimization was not an investment certificate, a deposit receipt

or other evidence of investment, but an "equity interest" evidencing a non-existent and legally impossible equity "investment" or "participation" in a Ponzi enterprise. As a result RNI should be treated as a Class A creditor. RNI does not request that it be treated any better or any differently than the other victims. As RNI acquired its "restitution" claim at the inception of its "investment" in MFC, in 1999, [12] over a <u>decade after</u> MFC began operating as a Ponzi scheme and a <u>decade before</u> the discovery of the scheme, RNI should be treated like any other victim who made "deposits" or "loans" to, or invested in, MFC, in violation of § 412:9-500.[13]

  **Third**, the Bankruptcy Court erred in finding that RNI should be denied a "restitution" claim because of RNI's "wrongful conduct" in failing to obtain pre-purchase approval from DCCA of RNI's "purchase" of stock. Regulatory approval assumes that MFC was a legitimate non-depository financial institution and that it had the right to sell shares up to 25% of its equity without DCCA's approval and

---

[12]  In *In re AFI Holding, Inc.*, 525 F.3d 700, 708 (9thCir. 2008); *In re United Energy Corp.*, 944 F.2d 589, 596 (9thCir. 1991), the Ponzi scheme victims who purchased equity interests in the Ponzi scheme received "restitution" claims that arose at the time of their investment.

[13]  The same issue of classifying substantially similar claims in a Chapter 11 case: "Whether the issue on appeal is denial of separate classification or approval of separate classification, the question resolved by the bankruptcy court is the same: are the claims substantially similar? To resolve that question, bankruptcy court judges must evaluate the nature of each claim, i.e., the kind, species, or character of each category of claims. *Cf. In re Los Angeles Land and Invs., Ltd.*, 282 F. Supp. 448, 454 (D. Haw. 1968) . . . *aff'd*, 447 F.2d 1366-67 (9th Cir. 1971)." *Steelcase Inc. v. Johnston (In re Johnston*), 21 F.3d 323, 327 (9th Cir. 1994).

over 25% equity interest with DCCA approval, or sell the stock without the transfer of control, which was not the case with a Ponzi scheme.

In finding that RNI engaged in "unlawful conduct" by not obtaining DCCA approval, the Bankruptcy Court was "blaming the victim" by denying RNI a restitution claim based on its attempt to purchase an "equity" interest in a Ponzi scheme. Under Ninth Circuit case law the purchaser or participant in a Ponzi scheme investment acquires a "restitution" claim at the time the investment is made, *supra,* n. 9, and RNI simply is trying to enforce its restitution claim that the Bankruptcy Court wrongly denied.

**Fourth**, the Bankruptcy Court wrongly disallowed RNI's restitution claim for "public policy" purposes, concluding that giving RNI a restitution claim would be "condoning" RNI's and MFC's "multiple statutory violations and would harm [MFC's] creditors who are among the parties that those statutes were meant to protect." (Dkt. 61:8, Adv. Proc.), The Court wrongly concluded that on "public policy" grounds RNI's "purchase of stock" in the decade-old Ponzi scheme should be treated the same as a sale of stock in a legitimate non-depository financial institution. By its terms, § 414-111(c) is designed to prevent directors and management of legitimate entities from issuing dividends and distributions when the entity is insolvent or would be rendered insolvent by virtue of the distributions. *Cf. Lippi v. City Bank*, 955 F.2d 599 (9th Cir. 1991). Such a statutory test cannot

19

apply to a Ponzi scheme.  Since MFC operated as a Ponzi scheme, it was deemed insolvent from its inception as a matter of law,[14] there could be no "profits" or "dividends," only circular "transfers" by MFC from one victim (RNI) to another victim (the other claimants or from them to RNI).  Since RNI learned after it filed its proof of claim of MFC's Ponzi scheme, the application of § 414-111(c) to a purported "distribution" by MFC (the last one to RNI in October 2008), was a legal nullity or a legal impossibility since MFC from the late 1980's was insolvent and could not distribute "dividends" as defined in § 414-3, H.R.S.

The Bankruptcy Court isolated RNI's purchase of MFC stock from MFC's other transactions, including the issuance of promissory notes for loans or receipts for deposits, and concluded that of all the numerous transactions in furtherance of MFC's Ponzi scheme, only the payments by MFC to RNI for the "repurchase" of RNI's "stock" were subject to the standards of conduct of a legitimate corporation. Under Ninth Circuit law, though, all of MFC's transactions from 1986 on were part of the Ponzi scheme,[15] and whether the transactions involved the issuance of stock

---

[14]  In the original Ponzi scheme case, *Cunningham v. Brown*, *surpa,* Chief Justice Taft noted as to Mr. Ponzi's scheme, "He was always insolvent, and became daily more so, the more his business succeeded."  265 U.S. at 8.  *See also Warfield v. Byron*, 436 F.3d 551, 558 (5thCir. 2006); *In re Carrozella & Richardson*, 286 B.R. 480, 486, n.17 (D. Conn. 2002); *In re ATM Financial Services LLC*, 2011 Bankr. LEXIS 2394 (Bankr. M.D. Fla. 2011)(". . . little debate that a company run as a Ponzi scheme is insolvent as a matter of law").

[15]  In *In re Slatkin*, 525 F.3d 805, 815 (9th Cir. 2008), when one of the transferees argued that some of its "transfers" came from the "legitimate" trades of a

certificates for the sale of stock to RNI, the issuance of promissory notes to the

public for prohibited loans or the issuance of receipts to other victims for

prohibited deposits, all the transactions were designed to funnel money into MFC

or prevent detection of the scheme or in furtherance of the scheme.[16]

> The mere fact that Slatkin reported income to [the IRS] is not inconsistent with his operation of a massive Ponzi scheme. Further, that Slatkin may have invested a small percentage of the funds he received from investors, and may have received a profit from such investments, does not create a genuine issue of material fact as to the actual existence of the Ponzi scheme.

*Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin*), 525 F.3d 805, 816 (9th

Cir. 2008). *See also Calvert v. Kooshian*, 2017 U.S. App. LEXIS 8657, at *2 (9th

Cir. 2017). Whether the activity to perpetuate the Ponzi scheme requires the

---

stockbroker-Ponzi scheme operator, and these "legitimate" profits should not be subject to avoidance or disgorgement, the court responded:

> As the [*Scholes v. Lehman*, 56 F.3d 750, 757-758 (7th Cir. 1995) (Posner, J.)] court explained, the source of the "profits" received by Phillips was "[a] theft . . . from other investors." …

> It is no answer that some or for that matter all of Phillips's profit may have come from "legitimate" trades made by the [debtor]. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations. Phillips was one of those investors, and it may seem "only fair" that he should be entitled to the profits; on trades made with his money. . . . It is not true as between him and either the creditors... or the other investors. . . .

[16] "'. . . [T]ransfers made in the course of a Ponzi operation could have been made for no purpose other than to hinder, delay or defraud creditors.' . . ." *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC*), 439 B.R. 284, 305 (S.D.N.Y. 2010).

issuance of promissory notes or investment certificates or common stock, as with RNI, all of these transactions were just part of Mr. Kimura's larger scheme to keep money coming in, circulating among the victims and preventing the Ponzi scheme from being detected.

This Court should reverse the Bankruptcy Court and find as a matter of law that the stock redemption agreement, the promissory notes issued to RNI and the alleged "dividends" were all part of Mr. Kimura's scheme to perpetuate and prevent detection of his Ponzi scheme and not the transactions of a legitimate financial institution.[17]  Under these circumstances, § 414-111(c) could not apply to the alleged "dividends" nor to any of the "transfers" to RNI by MFC and RNI's claim of at least $1,000,000.00 that it paid to MFC, should be allowed.

### D.   RNI'S CLAIM IS VALID UNDER § 502(B)(1)

---

[17]  A true shareholder can also be a creditor in a Ponzi scheme bankruptcy. *See Christian Bros. High Sch., supra,* n. 12, 439 B.R. at 298,  n.10:

> The law is the same in other jurisdictions.  [Citations omitted.] *Merrill v. Abbott (In re Independent Clearing House Co*.), 77 B.R. 843, 857 n. 24 (D. Utah 1987) (Ponzi scheme investors "had a claim against the debtors for the return of [their] money"; "[i]f there was a valid contract that gave the defendant an equity interest in the debtors' business, as the trustee contends, the defendant would still have had a right to restitution if the debtors' fraud induced him to enter into the contract.  *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 164 & 376 (1979).").

The Bankruptcy Court found that pursuant to § 544 the Trustee could avoid the transfers by MFC to RNI under both § 414-111(c) and § 651C-4(a), H.R.S. (Dkt. 61:8-9, Adv. Proc.),   The Bankruptcy Court then wrongly relied on its decision in applying the doctrine of issue preclusion to disallow RNI's claim under § 502(b)(1).[18]   First, § 502(d) provides a "clean slate" that obviates the bad faith that the Bankruptcy Court found (since RNI had not obtained DCCA approval); second, the Court wrongly applied § 414-111(c) only against RNI (thus denying RNI a restitution claim); and third, because the elements required to deny a claim under § 502(b)(1) are dramatically different from the elements of proof that the Court found regarding § 414-111(c) and § 651C-4(a).

The Bankruptcy Court found that "The trustee can avoid any transfer by [MFC] made 'with actual intent to hinder, delay, or defraud any creditor of the debtor . . .'" pursuant to § 651C-4(a).  (Dkt. 61:9, Adv. Proc.),  Since MFC was a Ponzi

---

[18]   Pursuant to § 502 . . . claims are deemed allowed unless objected to. . . . In the event an objection is filed, the . . . court is directed to determine the amount of the claim ". . . and shall allow [the] claim in [that] amount, except to the extent that" one or more of nine separate sets of circumstances may be found to exist. 11 U.S.C. § 502(b)(1)-(9).  The term "shall" is mandatory and generally acts as a command.  *Anderson v. Yungkau,* 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947).  Congress' use of the word "shall" in § 502(b) indicates that the court has no discretion and that it cannot deny a claim for reasons beyond those stated in the statute. . . .

*In re Taylor*, 289 B.R. 379, 384 (Bankr. N.D. Ind. 2003) (citations omitted).  *See also In re USA Commercial Mortgage, Co., supra*, at 8.

scheme that provided the elements of the Trustee's case and RNI had to prove that it had acted in good faith and that it had obtained the transfers "for a reasonably equivalent value." § 651C-8, H.R.S. The court found that RNI had not acted in good faith and that because it did not have a restitution claim it had not obtained the transfers "for a reasonably equivalent value," and, in addition, that RNI's position was "inconsistent with prior claims in its state court action." That RNI would pursue a contract law theory when suing in state court on the notes <u>before</u> RNI, DCCA, the federal government or the other victims learned of the Ponzi scheme and then pursue a different position in defending against the Trustee's § 651C-4(a) claim <u>after</u> it learned of the Ponzi scheme should not come as a surprise to anyone. RNI's Proof of Claim was supported by the final judgment issued in Civil No. 09-1-0037, almost 15 months before it was discovered that MFC was operating as a Ponzi scheme, and RNI filed its Proof of Claim nine months <u>before</u> Mr. Kimura's plea agreement.

Moreover, the elements of proof and defenses under § 651C-4(a) contrast completely with the Trustee's objection to RNI's claim under § 502(b)(1), which provides that "the court . . . shall allow such claim . . . except to the extent that . . . such claim is unenforceable against the debtor. . . ." Because RNI already had established that its claim against MFC <u>was</u> an enforceable state law claim and <u>actually had enforced</u> its state law claim before MFC filed bankruptcy, the final

24

judgment in Civil No. 09-0037 is the best evidence of a dispositive, liquidated pre-petition non-bankruptcy claim against MFC that supports RNI's April 1, 2010, proof of claim.[19]

The Trustee's argument fails because the crux is that the issue under § 502 ("claim is unenforceable against the debtor"), is vastly different than the issues in

---

[19]   Not only did MFC lose on the contract claim on which RNI obtained its judgment in Civil No. 09-1-0037, but, in addition, MFC would not have been able to defend against RNI's contract claim by relying on Ch. 651C or § 412-9:500 on which the Bankruptcy Court disallowed RNI's claim (due to the Trustee's unique bankruptcy powers under § 544).  A similar situation arose in *In re Asia Glob. Crossing, Ltd.*, 344 B.R. 247, 253 (Bankr. S.D. N.Y. 2006)(footnote omitted), where the court held that "the constructively fraudulent nature of the Guaranty does not render it unenforceable under non-bankruptcy law."  Just as much here, RNI did not have a claim against MFC that was "unenforceable under non-bankruptcy law," and the only reason that the Trustee could seek to avoid the transfers to RNI was because of the unique bankruptcy powers under § 544—that is, the very opposite of the requirement under § 502(b)(1) that a claim be "unenforceable under non-bankruptcy law."  The court in *Asia Glob. Crossing* explained that:

> . . . Since Asia Global could not have asserted [the constructively fraudulent nature of the Guaranty] as a defense to the Guaranty, the trustee cannot assert it under § 502(b)(1) as a reason to disallow 360networks' claim. . . . In short, the trustee lacks a basis under bankruptcy or non-bankruptcy law to object to the Guaranty on the ground that it was a constructively fraudulent obligation. . . .[7]

> [7]   This conclusion is also buttressed by the principle that statutes should not be interpreted in a manner that renders any provision superfluous. *Hibbs v. Winn*, 542 U.S. 88, 89, 124 S. Ct. 2276, 159 L. Ed. 2d 172 (2004); *Doe v. Chao*, 540 U.S. 614, 630-31, 124 S. Ct. 1204, 157 L. Ed. 2d 1122 (2004); 2A Norman J. Singer, SUTHERLAND STATUTORY CONSTRUCTION, § 46:06 at 181-192 (6th ed. 2000). . . .

the adversary proceeding under § 651C-4(a) ("transfer made or obligation incurred by a debtor is fraudulent as to a creditor"), and §§ 412:9-500 and 414-111, regarding dividends, discussed *supra*.  As such, the earlier judgment does not preclude factual allegations and legal issues pertaining to RNI's claim under § 502(b)(1).  Issue preclusion does not apply to issues not actually litigated when ". . . the bearing of the first determination is so marginal because of the separation in time and other factors negating any similarity that the first judgment may properly be given no effect."  RESTATEMENT (SECOND) JUDGMENTS, § 27, Comment "c."

Comment "a" provides:

> *"Subsequent action between the same parties.* The rule of issue preclusion is operative where the second action is between the same persons who were parties to the prior action, and who were adversaries . . . with respect to the particular issue. . . . A judgment for the plaintiff in the first action may have the effect of enabling him to recover in the second action without proving his claim, **provided that the controlling issues were litigated and determined in the prior action, but the defendant is not precluded from defending the second action on the basis of an issue not litigated and determined in the first action**."

(Emphasis added).  The original litigation regarding §§ 651C-4(a), 412:9-500 and 414-111did not deal with the same issue as disallowing a claim under § 502(b)(1) after payment under § 502(d), much less a purported "controlling issue."  Further, Comment "e," *"Issues not actually litigated,"* explains that "A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action. . . . [P]olicy considerations outlined

26

above weigh strongly in favor of nonpreclusion, and it is in the interest of predictability and simplicity for such a result to obtain uniformly."

Ignoring the plain, unambiguous language of § 502(b)(1), ignoring that the state law judgment in Civil No. 09-0037 in favor of RNI was a contested lawsuit resulting in a final judgment, and disregarding the *Rooker-Feldman* doctrine,[20] the Bankruptcy Court wrongly upheld the Trustee's objection under § 502(b)(1) and disallowed RNI's claim. In *Henshaw v. Field (In re Henshaw),* 670 Fed. Appx. 594, 595 (9th Cir. [Haw.] 2016), the Ninth Circuit concluded that the lower courts had misapplied the doctrine of collateral estoppel or issue preclusion and stated:

> Under federal law, collateral estoppel is available only when the contested issue is "identical to the one alleged in the prior litigation." *Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir. 1996), *quoting Callaway*, 10 F.3d at 1508. Four factors are relevant to this analysis: (1) whether there is "substantial overlap" in the arguments or evidence advanced in the first and second proceedings; (2) whether new evidence or argument requires application of a different rule of law; (3) whether the pretrial preparation and discovery during the first action could "reasonably be expected to have embraced the matter sought to be presented in the second"; and (4) how closely related the claims in the different actions are. *Disimone v. Browner*, 121 F.3d 1262, 1267 (9th Cir. 1997), *quoting* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c.

---

[20] The *Rooker-Feldman* doctrine is a rule of procedure regarding the enforcement of state court judgments in federal court under which bankruptcy courts lack subject matter jurisdiction to hear matters decided in state court. *See Rooker v. Fidelity Trust*, 263 U.S. 413 (1925), *District of Columbia's Court of Appeals v. Feldman*, 460 U.S. 462 (1983); 18 MOORE'S FEDERAL PRACTICE, ¶ 133.33[2](b) at 133-60.7, n. 24 (3d ed.); WRIGHT MILLER COOPER & AMAR, FEDERAL PRACTICE AND PROCEDURE 3d, ¶ 4106 at 603-04, n. 112.

> None of these factors supports applying collateral estoppel to the Henshaw Parents' counterclaim. . . .
>
> * * *
>
> Finally, the claims are related in that they seek the same outcome, but they are premised on completely different issues. . . .
>
> Consequently, there is no identity of issues . . . and therefore the bankruptcy court erred in applying collateral estoppel. . . .

*Id.,* 670 Fed. Appx. at 595 (cited in accord with FRAP 32.1 and Circuit Rule 36-3).

The state court judgment in favor of RNI constituted a valid state court claim that provided RNI with a claim that was unassailable under § 502(b)(1) since, as a final, non-appealable judgment (*see* § 108), that decision could not be challenged and the final judgment would have been accepted as a liquidated state law claim *if MFC had not been operating as a Ponzi scheme*.  While MFC's Ponzi scheme enabled the Trustee to set aside the transfers from MFC to RNI, the judgment still stands as evidence of a valid state court contested judgment that must be recognized and allowed under § 502(b)(1).  *See In Re CWS Enterprises, Inc.*, ___ F.3d ____, 2017 WL 4051708, at *10 (9th Cir. Sept. 14, 2017)(under issue preclusion the matter had been "fully contested and later confirmed by the judgment of a California court"); *Gayden v. Nourbakhsh (In re Nourbakhsh),* 67 F.3d 798, 800-01 (9th Cir. 1995)("The full faith and credit requirement . . . compels a bankruptcy court in a . . . nondischargeability proceeding to give collateral estoppel effect to a prior state court judgment"),  Here, while the Trustee

sought the "same outcome" of disallowing RNI's claim under both § 502(b)(1) and

§ 502(d), those theories "are premised on completely different issues."

"A claim cannot be allowed [under § 502(b)(1)] if it is unenforceable under

nonbankruptcy law," *Diamant v. Kasparian (In re Southern Cal. Plastics, Inc.)*,

165 F.3d 1243, 1247 (9th Cir.1999), but in this case, the pre-petition and pre-

discovery <u>contested</u> final judgment in Civil No. 09-0037 proved that there was <u>no</u>

state law defense to RNI's claim against MFC, as a legitimate corporation, and

thus the Trustee's objection cannot be sustained.  *See also Johnson v. Righetti (In*

*re Johnson)*, 756 F.2d 738, 741 (9th Cir.1985) ("[I]n proof of claim litigation under

11 U.S.C. § 502(b)(1), the validity of the claim is determined under state law").

In objecting to RNI's claim, the Trustee cited *Stoebner v. Ritchie Capital*

*Mgmt., L.L.C. (In re Polaroid Corp.*), 472 B.R. 22, 70 (Bankr. D. Minn. 2012),

Dkt. 884:9 for determining how to analyze "the trustee's request to disallow the

defendants' claims . . . pursuant to 502(b)(1)."  Dkt. 884:9.  In contrast to RNI's

claim that its claim is based on an undisputed payment to MFC, however, and

directly proving RNI's point, the court in *Stoebner* concluded in denying the

claimant's claim that:

> It is undisputed on the record at bar [1] that the Ritchie Defendants
> never lent money to the Polaroid Corporation; [2] that the Polaroid
> Corporation did not receive a penny of the money advanced under the
> notes in question; and [3] that the Polaroid Corporation did not
> guarantee the debt under the notes. So, the Polaroid Corporation [4]

had no pre-petition liability to the Ritchie Defendants under contract or applicable law, on account of the ten notes.  [472 B.R. at 72.]

RNI's claim presents the exact opposite of each of the four points in that case as (1) it is undisputed that RNI had paid $1,000,000 to MFC, (2) MFC received the $1,000,000, (3) MFC executed promissory notes to repay the $,1000,000 with interest, and (4) MFC had "pre-petition liability to [RNI] under contract [and] applicable state law, on account of the [] notes" that formed the basis of the judgment in Civil No. 09-1-0037.  The Bankruptcy Court erred in denying RNI's claim under § 502(b)(1).

## VI.   CONCLUSION

RNI is entitled to a reversal and vacation of the Memorandum of Decision and a remand of the case to the Bankruptcy Court with the instructions that if the Trustee wants to object to RNI's claim under § 502(b)(1) or attempt to subordinate the claim under § 510, the Trustee must proceed by way of an adversary complaint. In the alternative, the Trustee can allow RNI a Class A claim in the amount of $1,428,324.90, the amount paid to the Trustee in Adv. No. 10-90069, or in the amount of $1,000,000.00 that RNI paid to MFC in January 1999.

DATED:  Honolulu, Hawaii, September 28, 2017.

/s/ Jerrold K. Guben
JERROLD K. GUBEN
RANDOLPH R. SLATON
JEFFERY S. FLORES
Attorneys for Defendant-Appellant

30

## EXHIBIT 1

## STATEMENT OF DESIGNATION OF ISSUES ON APPEAL

1.     Whether the Bankruptcy Court erred in denying, contrary to the requirements of Rules 3007(b) and 7001(8), F.R.Bk.P., and LBR 3007-1(d), Appellant-RNI's written request to require that Appellee-Trustee's objection to RNI's claim be dismissed without prejudice and Appellee-Trustee be required to proceed by way of an adversary proceeding to pursue (i) its 11 U.S.C. § 502(b)(1) and Rule 3007(a), F.R.Bk.P., objection to Appellant-RNI's proof of claim, and (ii) Appellee-Trustee's request for subordination of Appellant-RNI's claim pursuant to 11 U.S.C. § 510(b) and § 510(c).

2.     Whether the Bankruptcy Court erred when it disallowed Appellant-RNI's claim under § 502(b)(1) even though (i) Appellee-Trustee acknowledged that Appellant-RNI paid the Debtor $1,000,000 in 1999, (ii) from 2007-2008, the Debtor transferred $1,040,000 to RNI, and (iii) after the $1,040,000 was avoided in Adv. No. 10-90069, Appellant-RNI paid $1,428,324.45 to the Estate as required by § 502(d), which included the avoided transfer of $1,040,000 and pre- and post-judgment interest, in order to qualify Appellant-RNI for participation in any distribution from the Estate in Case No. 10-00235.

3.     Whether the Bankruptcy Court erred in disallowing Appellant-RNI's proof of claim under § 502(b)(1) on the ground that Appellant-RNI had violated

Chapter 651C, Haw. Rev. Stat. (Uniform Fraudulent Transfer Act ("UFTA")), for issue preclusion purposes, even though (i) the elements of violation of Chapter 651C are different from the elements necessary to disallow a proof of claim under § 502(b)(1), and (ii) notwithstanding the receipt of a "fraudulent transfer," Appellant-RNI repaid to the Estate, under § 502(d), $1,428,324.45, the entire amount of $1,040,000 received from the Debtor plus pre- and post-judgment interest.

      4.    Whether the Bankruptcy Court erred in disallowing Appellant-RNI's claim under § 502(b)(1) on the grounds that Appellant-RNI had received a voidable pre-petition transfer based on Appellant-RNI's "purchase" of a $1,000,000 or a 40% "equity interest" in the Debtor in 1999, without state regulatory approval (*see* § 412:3-612, Haw. Rev. Stat.), where Appellant-RNI's purchase of Debtor's stock occurred 13 years after the Debtor commenced its Ponzi scheme in 1986, since as a Ponzi scheme, the Debtor could not sell and Appellant-RNI could not purchase an "equity interest" or stock interest in the Debtor's Ponzi scheme.

      5.    Whether the Bankruptcy Court erred in disallowing Appellant-RNI's claim under § 502(b)(1) for $1,000,000 (the amount contributed in 1999 to the Debtor), or  in the alternative, $1,428,324.45 (the amount repaid to the Estate pursuant to § 502(d)) or, in an amount determined by the Bankruptcy Court, on the

ground that Appellant-RNI received an "unlawful dividend" under § 414-111, Haw. Rev. Stat., when the Debtor had been operating from and after 1986 as a Ponzi scheme and thus as matter of law, the Debtor was (i) insolvent from and after 1986, and (ii) could not pay any "dividend," other than a transfer of funds from one group of contributor victims in the Ponzi scheme to pay another group of contributor victims, including Appellant-RNI, and such transfers to Appellant-RNI, by the pre-petition Debtor is not a statutory dividend, but merely a transfer of funds by the Ponzi scheme operator.

6.      Whether the Bankruptcy Court erred in disallowing Appellant-RNI's claim under § 502(b)(1) even though Appellee-Trustee has acknowledged that Appellant-RNI paid the Debtor $1,000,000 in 1999 and repaid the Bankruptcy Estate $1,428,324.45 (comprising the $1,040,000 principal amount transferred to Appellant-RNI pre-petition, plus pre- and post- judgment interest), thus satisfying 11 U.S.C. § 502(d) and qualifying Appellant-RNI for a distribution from the Estate.

7.      Whether the Bankruptcy Court erred in disallowing Appellant-RNI's claim under § 502(b)(1) on the ground that Appellant-RNI received an unlawful dividend of $1,040,000 in violation of § 414-111, Haw. Rev. Stat., when, as a matter of law, Appellant-RNI could not purchase, sell or redeem any stock interest in the Debtor nor could Appellant-RNI receive any "dividend," lawful or unlawful,

3

from the Debtor, since based on the criminal plea agreement of Mr. Lloyd Y. Kimura filed in the United States District Court for the District of Hawaii on January 5, 2011, the Debtor had been operating as a Ponzi scheme and thus as a matter of law was considered to have been insolvent from and after 1986 and could not pay any dividends.

8.　Whether the Bankruptcy Court erred in holding that Appellant-RNI violated § 412:9-500 and § 412:3-612, Haw. Rev. Stat., when Appellant-RNI could not, as a matter of law, purchase an "equity interest" in Debtor nor could Appellant-RNI receive an "unlawful" dividend nor a dividend of any type from the Debtor because (i) the Debtor had operated as a Ponzi scheme since 1986, 13 years before Appellant-RNI purportedly purchased an "equity interest" in the Debtor in 1999, and (ii) thus Appellant-RNI could neither have "purchased" nor "redeemed" the "equity interest" in the Debtor after 1986, when the Debtor began operating as a Ponzi scheme.

9.　Whether the Bankruptcy Court erred in disallowing Appellant-RNI's claim under § 502(b)(1) based on an incorrect application of the doctrine of issue preclusion by relying on its Memorandum Decision of May 16, 2011 in Adv. No. 10-90069, to the effect that Appellant-RNI purchased an alleged 40% equity interest in the Debtor, which purchase had not been approved by the state regulatory authorities, and received an unlawful dividend under § 414-111, as

such a conclusion of law is unwarranted insofar as the Debtor had been operating as a Ponzi scheme since 1986, and payment by the Debtor after 1986 was a transfer of funds from one group of contributor-victims to another group of contributor-victims, including Appellant-RNI, but not a dividend or stock redemption.

10.     Whether the Bankruptcy Court erred in disallowing Appellant-RNI's claim notwithstanding that Appellant-RNI indisputedly paid the Debtor $1,000,000 in 1999, received $1,040,000 by way of Ponzi scheme transfers in 2007-2008, and repaid the estate $1,428,324.45 (including pre- and post-judgment interest), pursuant to § 502(d), which requires that Appellee-Trustee allow and recognize RNI's proof of claim in the amount of $1,000,000, the amount paid in 1999 or $1,428,324.45, the amount repaid to the Estate pursuant to § 502(d), or in an amount to be determined because it is uncontested that Appellant-RNI contributed $1,000,000 to the Debtor's Ponzi scheme in 1999.

11.     Whether the Bankruptcy Court erred in disallowing Appellant-RNI's claim under § 502(b)(1) on the ground that Appellant-RNI received a "fraudulent transfer" under Chapter 651C, Haw. Rev. Stat., since the receipt of a voidable fraudulent transfer under Chapter 651C does not disqualify Appellant-RNI from participating in a distribution from the Estate or establish grounds for the disallowance of Appellant-RNI's proof  claim under § 502(b)(1) because Appellant-RNI repaid the $1,040,000 (plus pre- and post-judgment interest),

5

pursuant to  § 502(d), in order to participate in and qualify for a distribution from the Estate.

12.     Whether the Bankruptcy Court erred in disallowing Appellant-RNI's claim under § 502(b)(1) on the ground that Appellant-RNI did not receive statutorily required regulatory approval under Chapter 412:3-612, Haw. Rev. Stat., to purchase a 40% "equity interest" in the Debtor for $1,000,000, because the Debtor had been operating as a Ponzi scheme since 1986, and thus, as a matter of law, the Debtor could not, in 1999, sell Appellant-RNI an "equity interest" and Appellant-RNI could not buy an "equity interest," in any percentage, with or without regulatory approval after 1986, when the Debtor first started operating as a Ponzi scheme.

13.     The Bankruptcy Court erred in failing to hold that § 510(b) did not apply, as a matter of law, to Appellant-RNI's contribution to the Debtor's Ponzi scheme because, as a matter of law, (i) Appellant-RNI could neither purchase , sell or redeem stock in the Debtor as the Debtor was operated as a Ponzi scheme from 1986, (ii) Appellant-RNI could neither purchase nor sell a stock or equity interest as defined by § 510(b), (iii) any payment in 1999 by Appellant-RNI was a contribution to the Ponzi scheme and not a "purchase" of stock, and (iv) any transfer of funds by the Debtor to Appellant-RNI was neither a "stock redemption" or purchase of stock since the pre-petition payments by the Debtor was by a

transfer of funds from one group of victims of the Ponzi scheme to another group of victims of Debtor's Ponzi scheme, including Appellant-RNI.

**EXHIBIT 2**

**STATUTORY AND RULE REFERENCES**

1. Official Form hib_3007-1 (12/09) reads:  "[Note: Fed. R. Bankr. P. 3007(b) provides that an objection to claim may not include a demand for relief of the kind specified in Fed. R. Bankr. P. 7001. Such relief must be sought by filing a complaint to commence an adversary proceeding.]"

2.   Rule 3007(b), F.R.Bk.P.: "Demand for Relief Requiring an Adversary Proceeding," reads:  "A party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding."

3. LBR 3007-1(d), "Objection Requiring Adversary Proceeding," reads: "An objection to claim that includes a demand for relief of a kind specified in Bankruptcy Rule 7001 may not proceed under the procedures described in this rule.  Such an objection requires the filing of a complaint to commence an adversary proceeding."

4.  Section 502(d) reads:  ". . . the court shall disallow any claim of any entity . . . that is a transferee of a transfer avoidable under section . . . 544 . . . *unless such entity or transferee has paid the amount* . . . for which such entity or transferee is liable . . . ."

5.  Section 412:9-500, H.R.S., reads:

   **Prohibitions.**   Except as otherwise expressly authorized by this chapter or other law, a nondepository financial services loan company shall not solicit, accept, or hold deposits, investment certificates, thrift certificates, or other accounts or instruments identical or similar to a deposit account, nor shall it borrow money in the form of, or issue, promissory notes, debentures, bonds, or other obligations to the public. . . .

EXHIBIT 3

**Date Signed:**
**September 7, 2017**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

In re

MAUI INDUSTRIAL LOAN &
FINANCE COMPANY, INC.,

                    Debtor.

Case No. 10-00235
Chapter 7

Re: Docket No. 838 and 869

## MEMORANDUM OF DECISION ON
## TRUSTEE'S MOTION FOR INSTRUCTIONS
## AS TO DISTRIBUTION RIGHTS OF CERTAIN CREDITORS

The question presented is whether, in a Ponzi scheme case, the timely-filed

claims of investors for lost profits should be paid before or after the untimely-filed

claims of investors for lost principal. I conclude that the timely claims should be paid

first, including the lost profits portion of the timely claims.

I.    FACTS

Maui Industrial Loan and Finance Co., Inc. (which did business as Maui

Finance Company and which I will call "MFC") was a company that was authorized

to make loans but not authorized to accept deposits from the public. Lloyd Kimura

controlled MFC.

After a state regulator ordered MFC to cease doing business, MFC commenced this bankruptcy case.

The court initially fixed May 12, 2010, as the deadline to file proofs of claim, but the claims deadline was later reset to May 17, 2010.[1]  Notice of the deadline was given to all creditors and other parties in interest revealed on the debtor's schedules.

In a federal plea agreement, Mr. Kimura admitted that he operated MFC as a Ponzi scheme for about twenty-three years.[2] He caused MFC to "borrow" money from investors in exchange for promised returns, and to repay the loans and the promised returns mostly with funds borrowed from subsequent investors. Eventually, the iron laws of mathematics caused the scheme to collapse.

Also early in the case, the trustee moved the court to separate the investors' unsecured claims into Class A, consisting of lost principal invested, and Class B, consisting of lost profit or benefit of the bargain damages, and to subordinate allowed Class B claims to allowed Class A claims.[3] The trustee recommended this classification in order to treat all investors fairly. The trustee gave notice of the motion to all known

---

[1] Dkts 16 and 22.

[2] *United States v. Kimura*, Case No. 10-CR-00890 (D. Haw.).

[3] Dkt. 234.

2

creditors and parties in interest,[4] no one objected to it,[5] and the court entered an order granting it.[6] The order does not distinguish between timely and untimely filed claims.

In the meantime, the trustee engaged in extensive litigation and liquidation efforts. Largely as a result of a carefully planned and skillfully executed litigation program, the trustee today holds about $8 million in funds for distribution.

The timely filed claims amount to about $8.1 million, of which about $5.8 million is the principal amount and about $2.3 million represents investment returns. There are also tardily filed claims totaling about $2.6 million.[7] Many of the late claims were filed less than ten days after the deadline.

The trustee filed a motion for instructions regarding the distribution of those funds. He stated that, when he initially proposed the classification scheme, he had no reason to think that his litigation recoveries would be as large as they turned out to be. Although he made no recommendation, he suggested that it might be appropriate to subordinate the timely filed Class B (lost profits) claims to untimely filed Class A (lost principal) claims.

After the initial hearing on the trustee's motion for instructions, the court

---

[4] Dkt. 236.

[5] Dkt. 250.

[6] Dkt. 253.

[7] Dkt. 838-1, -2, and -3.

3

issued an order to show cause directed to eight creditors who filed untimely claims.[8]

The order gave those claimants an opportunity to "provide a legally sufficient reason

why [their] claim[s] should be treated the same as claims that were filed on time."

Three claimants – Snap-on Credit LLC, Hamai Appliances, Inc., and David

and Irene Miyake – filed timely responses to the order.[9] The trustee and other

creditors filed replies.[10]

## II.   DISCUSSION

11 U.S.C. § 726(a) (in relevant part) provides that the trustee must distribute

the property of the estate in the following order:

> (1)   first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title, proof of which is timely filed . . .
>
> (2)   second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is--
>
> (A)   timely filed under section 501(a) of this title;
>
> (B)   timely filed under section 501(b) or 501(c) of this title; or
>
> (C)   tardily filed under section 501(a) of this title, if--
>
> (i)   the creditor that holds such claim did not

---

[8] Dkt. 869. The court directed the order to the eight claimants listed as untimely claims in the trustee's motion for instructions. Dkt. 838-2. According to the proof of claim register, many additional parties filed claims after the bar date. Some of those claims have been withdrawn, and others may have been timely under one or more of the exceptions specified in Fed. R. Bankr. P. 3002(c). I assume that the trustee will separately address, as necessary, the other claims filed after the bar date.

[9] Dkts. 893, 895, and 897.

[10] Dkts. 905, 916, and 919.

> > have notice or actual knowledge of the case in
> > time for timely filing of a proof of such claim
> > under section 501(a) of this title; and
>
> > (ii)   proof of such claim is filed in time to permit
> > payment of such claim;
>
> (3)   third, in payment of any allowed unsecured claim proof of which
> is tardily filed under section 501(a) of this title, other than a claim
> of the kind specified in paragraph (2)(C) of this subsection;
>
> (4)   fourth, in payment of any allowed claim, whether secured or
> unsecured, for any fine, penalty, or forfeiture, or for multiple,
> exemplary, or punitive damages, arising before the earlier of the
> order for relief or the appointment of a trustee, to the extent that
> such fine, penalty, forfeiture, or damages are not compensation for
> actual pecuniary loss suffered by the holder of such claim . . . .

## A.    The Snap-on Credit LLC Claim Must Be Treated as Timely.

In response to the order to show cause, Snap-on Credit LLC filed a declaration stating that it did not obtain actual knowledge of MFC's bankruptcy filing until January 19, 2011, well after the bar date.[11] The trustee (and the record) confirm that MFC did not list Snap-on as a creditor, and that as a result Snap-on did not receive notice of the bankruptcy filing or the bar date. No one provides any evidence to the contrary. Therefore, section 726(a)(2)(C) applies to Snap-on's claim.

Creditor Jody C. Boeringa points out that Snap-on waited about four months to file its claim.[12] But the statute only requires that a creditor that was ignorant of the bankruptcy filing file its claim "in time to permit payment of such claim." Snap-on

---

[11] Dkt. 893 at 5-6.

[12] Dkt. 919 at 3.

5

filed its claim in 2011 and only now, in 2017, is the trustee almost able to begin making distributions.

### B.     The Hamai Appliances and Miyake Claims Were Untimely

Hamai Appliances, Inc., and David and Irene Miyake say that they hired an attorney in March 2010 to represent them in MFC's bankruptcy. Therefore, they knew of MFC's bankruptcy filing well in advance of the May, 17, 2010, bar date. They say that they gave their attorney the information required to file a proof of claim on their behalf but that he inexplicably filed their claims about a week late. (The same attorney filed timely claims for other clients.)

These explanations do not satisfy the requirements of section 726(a)(2)(C). Further, the court may not disregard the late filing of a proof of claim based on the claimant's neglect, even if excusable.[13]

Therefore, the Hamai Appliances and Miyake claims are covered by section 726(a)(3).

### C.     Timely Class B Claims Must Be Paid Before Untimely Claims.

The trustee suggests (but is careful not to advocate) that the court might clarify its prior order to provide that the Class A portion of untimely filed claims should be

---

[13] *Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993) ("The "excusable neglect" standard of Rule 9006(b)(1) governs late filings of proofs of claim in Chapter 11 cases but not in Chapter 7 cases.").

6

paid before the Class B portion of timely filed claims. He points out that claims for lost investment returns in a Ponzi scheme are unenforceable.[14] This indicates that each Class B claim should be treated as a "fine, penalty, or forfeiture" under section 726(a)(3) and subordinated to all timely and untimely compensatory claims. He suggests that it would be more equitable to pay timely Class A claims first, untimely Class A second, and both timely and untimely Class B claims third.[15] Although I appreciate the trustee for bringing this issue to the surface, I think that the timely filed claims, both Class A and Class B, must be paid before untimely claims.

First, the Class B claims are not unenforceable. All of those claims are the subject of filed proofs of claim. Therefore, they are "deemed allowed" unless and until a party in interest objects to them,[16] and no one has done so.

Second, even if the Class B claims were unenforceable, it would not necessarily follow that section 726(a)(4) would apply. That section applies only to fines, etc., "to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim . . . ." The Class B claims are "compensation for actual pecuniary loss"; they represent the loss of a real amount of

---

[14] *Janvey v. Brown*, 767 F.3d 430, 440-42 (5th Cir. 2014); *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008).

[15] *In re Taubman*, 160 B.R. 964, 980-82 (Bankr. S.D. Ohio 1993).

[16] 11 U.S.C. § 502(a).

7

money, the investment returns that MFC promised but did not provide.

Third, the Supreme Court has repeatedly warned that bankruptcy courts may not use their equitable powers to override the Bankruptcy Code. "It is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code. Section 105(a) confers authority to carry out the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. . . . We have long held that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."[17] Section 726 specifically lays out the order in which claims are paid. The bankruptcy court has no power to overturn the Congressional ordering of distribution rights.[18]

## III.   CONCLUSION

For these reasons, the court will instruct the trustee to pay, to the extent funds are available, all timely filed Class A investor claims, then all timely filed Class B investor claims, then all untimely filed Class A investor claims, and then all untimely

---

[17] *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) (citations and internal quotation marks omitted).

[18] The prior order creating the Class A and Class B distinction does not overturn section 726. That order creates subcategories within one of the statutory categories. It does not provide that claims that Congress placed in a lower category will receive distributions before claims in a higher category are paid in full. Further, no one has ever objected to the division of timely claims into two subclasses.

8

filed Class B investor claims. Counsel for the trustee shall submit a proposed final judgment.

END OF ORDER

## CERTIFICATE OF COMPLIANCE

Pursuant to the Rule 8015(a)(7), F.R.Bk.P., I certify that the Appellant's Opening Brief on Appeal uses a 14 point Times New Roman font, proportionally spaced, and consists of a total of 6,463 words and 548 lines, which is no more than half of the 14,000 words and 1,300 lines allowed by the Rule 8015(a)(7). The word count set forth herein was provided by this law firm's word processing system which produced the attached Appellant's Opening Brief on Appeal.

DATED: Honolulu, Hawaii, September 28, 2017.

*/s/ Jerrold K. Guben*
JERROLD K. GUBEN
RANDOLPH R. SLATON
JEFFERY S. FLORES
Attorneys for Defendant-Appellant
RNI-NV LIMITED PARTNERSHIP

# CERTIFICATE OF SERVICE

The undersigned hereby certify that on September 28, 2017, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District Hawaii by using the CM/ECF system.

I further certify that all parties of record to this proceeding who are either registered CM/ECF users, or who have registered for electronic notice were duly served through the CM/ECF system.

DATED: Honolulu, Hawaii, September 28, 2017.

*/s/ Jerrold K. Guben*
JERROLD K. GUBEN
RANDOLPH R. SLATON
JEFFERY S. FLORES
Attorneys for Defendant-Appellant
RNI-NV LIMITED PARTNERSHIP